UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| CROSSOVER FINANCIAL I, LLC | ) | Case No. 11-24257 SBB |
| EIN 20-3295455 | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

## MOTION TO DISMISS CHAPTER 11 CASE PURSUANT TO 11 U.S.C. §1112(b)

Creditors, WILLIAM R. BOWMAN AND GERI A. BOWMAN; BRUCE D. HACKER AND NANCY J. HACKER; H. THOMAS HALL AND LOUISE M. HALL; DONNA M. HARMON; JAMES B. HOUSE; CURTIS MASSEY; KATHLEEN H. BARTON;  INTEGRITY BANK & TRUST, f/b/o "IBAT," a Colorado corporation STEPHEN L. SCHWARTZBACH (hereinafter collectively referred to as "Creditors"), through their counsel, Daniel K. Usiak, Jr., move the Court for an Order, pursuant to 11 U.S.C. §1112(b), dismissing the within Chapter 11 case.  In support of their motion, the Creditors state as follows:

<u>JURISDICTION</u>

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The statutory basis for the relief requested herein are sections 362(d)(1) & (2) and 1112(b) of the Bankruptcy Code, Bankruptcy Rules 1017(f)(1), 4001(a), and 9014 and Local Rules and Local Rules 2081-3 and 4001-1.

<u>PRELIMINARY</u>

2.      First Regional Bank c/o Trust Administrative Services Corporation FBO Philip P.

1

DeCelles, Account #xxx797, by and through Philip P. DeCelles, note holders, and The DeCelles Trust dated January 10, 2006, Philip P. DeCelles, Trustee, or Nancy L. DeCelles, Trustee, by and through Philip P. DeCelles and Nancy L. DeCelles, as C0-Trustees (hereinafter collectively referred to as "DeCelles") filed a similar Motion to Dismiss Chapter 11 Case on September 20, 2011. (Docket No. 43)

<u>BACKGROUND</u>

3.      Since the date of the filing of its bankruptcy petition, the Debtor has remained in possession of its assets, and has operated as a Debtor-in-Possession pursuant to 11 U.S.C. §§1107 and 1108. The Debtor is a Colorado limited liability company formed on August 12, 2005. (Ex. 1, Articles of Incorporation.)  Mitchell B. Yellen (Yellen) is the manager and the sole member of the Debtor.  (Ex. 2, Statement of Financial Affairs, para. #21.)

4.      The Debtor was formed for the sole purpose of raising approximately $20 million through the issuance of promissory notes to investors.  (Ex. 3, Private Placement Memorandum or PPM, p. 18, section entitled "Business of Company".)  The net proceeds received by the Debtor from investors would then be loaned to an entity ultimately known as HPR, LLC f/k/a Home Place, LLC (HPR).  (Ex. 3, PPM, p. 18.)  HPR would then use the loan from the Debtor to purchase approximately 440 acres of vacant land, develop the land into a residential subdivision, and then sell the real property.  (Ex. 3, PPM, p. 18.)  The Debtor did "not intend to engage in, or pursue, any other business other than to make the loan" to HPR.  (Ex. 3, PPM, p. 18.)

5.      HPR consisted of three members, one of which was also an entity owned and operated by Mitchell Yellen known as Yellen Family Partnership, LLLP.  (Ex. 4, HPR Operating Agreement,

2

p. 1.)  Mitchell Yellen's entity owned a 42.5% interest in HPR.  (Ex. 4, HPR Operating

Agreement, p. 6.)

6.      The Debtor raised funds pursuant to the PPM (Exhibit 3).  In exchange for investing with

the Debtor, individuals and entities that invested in Crossover (hereinafter collectively referred to

as "Investors") received promissory notes with interest at 9% per annum with default interest at

11% per annum. The present Creditors were among the group of Investors.

7.      The Investors made investments with the Debtor primarily during the year 2005 and parts

of 2006.  The Debtor raised approximately $21 million during that time period.  The Debtor

owes the Creditors in excess of $6.6 million.

8.      The Debtor, in turn, loaned $20 million to HPR on or about Dec. 13, 2005, at which time

HPR issued a Deed of Trust and Promissory Note for the benefit of the Debtor (Crossover)

requiring interest to be paid at 13% from HPR to Crossover.  (Ex. 6, Deed of Trust and

Promissory Note.)  In addition, P. Dale Beggs, Mitchell Yellen, and Dale Turner each executed

personal guarantees for HPR's debt to Crossover.  (*See e.g.*, Ex. 7, Personal Guarantee of

Yellen.)

9.      With the money loaned, HPR purchased the 440 acres of vacant land (the Land) for

$12,423,529.00 from Sally Beck/Home Place Ranch, LLC.  (Ex. 8, Warranty Deed.) (The Sally

Beck entity is called "Home Place *Ranch*, LLC" – not to be confused with HPR's former name

of "Home Place, LLC.")  In addition, HPR used the loan proceeds to make payments back to

Crossover, as well as pay for some costs of development, which were estimated to eventually

amount to $3.8 million according to the PPM.  (Ex. 2, PPM, pp. 16-17.)  In other words, HPR's

3

13% interest payments to the Debtor (Crossover) were paid from the money originally loaned to HPR by the Debtor.  From this repayment by HPR, Crossover/Debtor then paid the Investors their 9% interest payments.  So, in reality, the Investors were being paid interest on their promissory notes with their own money.  In addition to the interest payments and development costs, management fees were paid to members of HPR at varying amounts but believed to be in the $20,000 per month range. How Crossover and HPR spent the rest of the Investors' money is currently unknown, and there has been no accounting of how all of the Investors' money was spent.[1]

10.     By at least August of 2007, Crossover and HPR had spent the entire $21 million invested, and HPR did not have the funds necessary to proceed with the development of the Land.  Thus, the 440 acres simply remained and continues today to remain as undeveloped, agricultural grazing land.   (Ex. 9, Assessor's Record.)   HPR stopped making payments to Debtor (Crossover), and the Debtor, in turn, stopped paying the Investors.  The Investors' promissory notes went into default in approximately December 2007.

11.     An appraisal was performed on the Land in or around March of 2007 by Thomas Colon. Mr. Colon authored an affidavit in DeCelles' El Paso County state court action against the Debtor, Case No. 2010CV2880, in which Mr. Colom stated his appraisal was based on "extraordinary assumptions," including the making of a payment of $9 million to Tri-View Metropolitan District by HPR.  (Ex. 10, Affidavit, para. 4.)  Since the $9 million was never paid

---

[1]     Creditors filed an accounting claim in state court in order to determine how their money was spent and whether the Investors' money was spent according to the promises made in the PPM (Case No. 2011CV2752, El Paso County District Court). An answer by HPR was filed on August 12, 2011, and the accounting claim remains

4

to Tri-View, Mr. Colon opined the Land at the time was worth $16,995,917.00.  (Ex. 10, Affidavit, para. 8.)

12.      In November 2007, Yellen caused the Debtor and HPR to enter into a "deed in lieu of foreclosure" agreement.  (Ex. 11, Agreement and related documents)  The agreement ostensibly deeded the Land to the Debtor in exchange for not suing HPR on the $20 million note.  (Ex. 11, Deed in Lieu, para. 5.)  The Deed in Lieu also ostensibly released the personal guarantors of the HPR debt – including Yellen.  The agreement was entered into even though the Land had not been developed and at least a $3 million deficiency existed between the amount owed to HPR and the value of the vacant property.  (Ex. 11, Deed in Lieu, para. 5; *see also* Ex. 10, Affidavit, para. 8.)  By directing the Deed in Lieu transaction, Yellen simultaneously caused himself to be released of his personal guarantee to Debtor/Crossover and obtained control of the Land as the sole member/manager of the Debtor/Crossover.  (Ex. 11, Deed in Lieu, para. 7.)

13.      The economy deteriorated, and potential developers pulled out of the project and there has been no activity on the Land since 2007, including no site work or development of any kind.

14.      The Debtor currently values the Land at $14 million.  As explained by the Debtor, this valuation is based upon Mr. Colon's 2007 appraisal cited above.  To arrive at a value of $14 million, the Debtor claims to have reduced the 2007 appraisal value by one-half due to the severe decline in the real estate market.  However, as discussed above, the vacant property was worth approximately $16 million in 2007, not the $28 million cited by the Debtor.

15.      Utilizing the Debtor's methodology, and reducing this amount by one-half, would result

_____

pending.

5

in a current value of approximately $8 million – although it is believed that presently a truer valuation of the Land may be $5-$7 million.

16.     The Debtor lists total claims of $30,475,601.79 on Schedule D of its bankruptcy filing. Under either valuation, the Debtor is insolvent and has no equity in the Land.

17.     The Land is the Debtor's sole asset.  There are two houses located on the Land.  One house is rented out by the Debtor as a residence on a month to month basis with rent at $1,500 per month.  The Debtor also has a grazing lease on the Land which generates $500 every quarter. The monthly rental from the house and the quarterly grazing fees are the Debtor's only sources of income.  The Debtor uses this income to keep the real property taxes current.  The other house is not habitable.

18.     This is a "single asset real estate case," although the Debtor's bankruptcy petition fails to correctly disclose this fact.

19.     As of March 2010, the Land was not encumbered, with the exception of a mechanic's lien recorded on March 3, 2008 by Nolte & Associates, Inc. in the amount of $226,346.03.  Nolte & Associates, Inc. later obtained a state court Judgment in the amount of $448,346.63 on April 8, 2010 due to HPR's failure to use the monies loaned to it to pay engineering fees incurred for the development of the Land.  Nolte & Associates, Inc. recorded a Transcript of Judgment on April 22, 2010.  The Judgment was acquired by Colorado Capital Ventures, LLC.  A small number of the Investors (not including the Creditors) are the members of Colorado Capital Ventures, LLC.

20.     In 2009, Ross A. Reineke (Reineke), an Investor, filed suit in the Douglas County District Court to collect on his promissory note.  Reineke obtained a Judgment against the Debtor in the

amount of $563,417.60, plus interest.  Prior to the Judgment entering, on or about Dec. 9, 2009, Debtor filed a motion requesting all of the investors be joined as parties to the case.  As the basis for this motion, the Debtor stated: "Joinder of each of the investors is necessary so that if a default is found, and that judgment enters against the LLC [Debtor], one investor is not allowed to jump ahead of the other investors."  (Ex. 12, Motion, para. 6.)  As part of the prayer for relief for the motion, the Debtor further requested an Order "requiring Plaintiff [Reineke] to name each of the additional investors so that each of the investors are on equal footing and Plaintiff is not allowed to inappropriately go ahead of the line."  (Ex. 12, Motion, para. 6)  The Court denied the motion on March 18, 2010, finding that the case was "a promissory note case and the additional note holders are not necessary for a resolution of this dispute."  (Ex. 12, Order.)   The Judgment entered for Reineke and against Debtor on August 16, 2010, and a Transcript of Judgment was recorded on August 25, 2010.

21.     On May 4, 2010, DeCelles commenced state court proceedings in the El Paso County District Court (Case No. 2010CV2880) against Debtor seeking, among other things, to collect on their promissory notes.

22.     Yellen caused deeds of trust to be recorded against the Land:

    a.      April 16, 2010 Deed of Trust in the amount of $130,000 for Crossover and Yellen's attorneys, M. James Zendejas and Stinar & Zendejas, LLC (the Zendejas Deed of Trust);[2]

    b.      June 21, 2010 Deed of Trust in the amount of $90,000 for Crossover and Yellen's

attorneys, Allen & Vellone, P.C. (the Allen & Vellone Deed of Trust);

c.    June 25, 2010 Deed of Trust in the amount of $21,542,000 for the Investors (the Investors Deed of Trust);[3]

d.    March 4, 2011 Deed of Trust in the amount of $250,000 for Colorado Capital Ventures 3, LLC, which is composed of a small number of Investors in the Debtor (the CCV3 Deed of Trust); and

e.    March 21, 2011 Deed of Trust in the amount of $21,542,000 for the Investors, which appears to have been filed to correct the clerical error in the Investor Deed of Trust.

(Ex. 14, O&E Report)

23.    On April 1, 2011, DeCelles commenced further litigation in the El Paso County District Court (Case No. 2011CV2430) seeking to avoid the recording of the deeds of trust listed above. DeCelles claims the deeds of trust, including the Investors Deed of Trust, constitute fraudulent conveyances under the Colorado Uniform Fraudulent Transfer Act.  All of the Investors were named as parties to the suit, since the Debtor had listed them as beneficiaries under the Investors Deed of Trust.

24.    On April 19, 2011, the Creditors, filed suit in the El Paso County District Court (Case No. 2011CV2752) to collect on their promissory notes and for an accounting.  Creditors obtained

---

[2]    On April 26, 2010, there was a second Deed of Trust recorded for the benefit of Zendejas in the amount of $130,000.  This appears to be a duplicate of the earlier Zendejas Deed of Trust filed on April 16, 2010.
[3]    This Deed of Trust appears to have a clerical error in that some of the investors' names were left off when legal sized paper was copied onto letter sized paper.

a Judgment in the total amount of $6,608,198.29 on their promissory notes on May 18, 2011, and they recorded a Transcript of Amended Judgment on May 18, 2011. (Ex. 5, Transcript) The Creditors' accounting claim is still pending, but the portion of the claim against Crossover has been stayed due to its filing Chapter 11 bankruptcy.

25.     In connection with DeCelles' fraudulent conveyance litigation of May 2011, a total of 68 Investors (who had been named as Defendants in the litigation) obtained Judgment against Crossover on June 9, 2011 for a total of $17,417,561 based on their cross claims for breach of their promissory notes.  (Ex. 14, O&E.)

26.     As a result of the state court litigation in both the Douglas and El Paso County District Courts, a total of 82 of the 107 Investors (76% of the Investors) have pursued state court remedies against the Debtor and have obtained state court judgments against the Debtor. (Ex. 14, O&E.)

27.     The Debtor filed its Chapter 11 bankruptcy on June 15, 2011 to block the state court litigation.

28.     The Debtor filed bankruptcy Statements and Schedules that are not complete or accurate. For example, the Debtor's Voluntary Petition fails to identify that it is a single asset real estate case.  The Debtor failed to disclose all of the lawsuits that have been filed against it to date.  The Debtor failed to correctly identify the nature of the claims of its creditors who have obtained state court judgments against the Debtor.  The Debtor's Schedules failed to identify the Debtor's co-obligors.  Further, upon information and belief, the Debtor did not accurately value its Land.

29.     The Debtor has no employees, no ongoing business operations, and minimal income. (Ex.

9

13, DIP bank statement)

30.    At the Meeting of Creditors, Yellen testified under oath that the purpose of the Chapter

11 filing was to stop the Investors from proceeding with their state court litigation.  Based upon

statements made under oath at the Debtor's Meeting of Creditors and the Court's Status and

Scheduling Conference, the Debtor is proposing a vague "liquidating plan" which could entail

holding on to the Land for as long as 10 years until, hopefully, the value of the Land increases.

The Debtor is "exploring" the hiring of a broker in connection with a sale of the Land, but it has

not yet followed through with this.  The purported goal of the Chapter 11 is to supposedly treat

all Investors "equally."  As of the date of this motion, the case has been pending before the Court

for over three (3) months.  The Debtor has filed a request to set a bar date which has been

granted, but has taken no further action in Court to move forward with its "reorganization".

<u>ARGUMENT FOR DISMISSAL PURSUANT TO 11 U.S.C. §1112(b)</u>

31.    Pursuant to 11 U.S.C. §1112(b), on request of a party in interest, "the court shall convert

a case under this chapter to a case under chapter 7 *or dismiss a case* under this chapter,

whichever is in the best interest of creditors and the estate, if the movant establishes cause."

(Emphasis added.)

32.    While §1112(b)(4) does not provide an exclusive list of grounds for "cause" under

§1112(b), it is "well established under the bankruptcy code … that a chapter 11 petition must be

filed in good faith, and if not, dismissal of the case is an appropriate remedy."  *In re Pacific Rim*

*Investments, LLP*, 243 B.R. 768, 771 (Bankr. D. Colo. 2000).

33.    The purpose of the good faith requirement is to "prevent abuse of the bankruptcy process

by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes". *In re Little Creek Development Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986).  The determination of "whether a debtor's filing lacks good faith is determined by the court's on-the-spot evaluation of the debtor's financial condition, motives and local financing realities." *In re Little Creek Development Co*., 779 F.2d at 1072.  In making this determination, Courts consider the "classic badges" of a bad faith bankruptcy filing.

34.     Such "classic" badges of bad faith include:

    a.      The debtor has one asset;

    b.      The debtor has no ongoing business operations, income, cash flow or employees;

    c.      The Debtor filed its petition at a time when the Creditors were undertaking legitimate collection activities;

    d.      The debtor is proposing a liquidation plan as a means of delaying the collection activities of its legitimate creditors;

    e.      The debtor and/or the debtor's principal have engaged in wrongful activities prior to the filing of the bankruptcy petition;

    f.      The debtor has abused the jurisdiction of the Bankruptcy Court by filing its petition in order to cause the court to exercise its jurisdiction to frustrate and delay creditor actions in collecting on their debts;

    g.      The timing of the filing of the bankruptcy petition makes it clear that the motive of the Debtor is to stop creditors from pursuing their state court remedies; and

      h.     The debtor's bankruptcy statements and schedules are inadequate, inaccurate or misleading.

35.     The above referenced badges are not an exhaustive list.  The Court must look to the totality of the circumstances in determining whether a Chapter 11 filing was made in bad faith. *See In re Pacific Rim*, 243 B.R. at 773.

36.     The Debtor's Chapter 11 filing demonstrates bad faith, and the Court should dismiss the bankruptcy case.

37.     The Debtor's sole asset is the Land, which is a vacant parcel of undeveloped raw land located in El Paso County, Colorado.  There has been no activity on the Land since 2007.  There is no equity in the Land as the Debtor's debts far exceed the value of the Land.  There is no prospect in the foreseeable future that the Land can be developed or sold, and there is little to no hope of the Debtor being able to obtain financing to continue developing the Land.

38.     The Debtor (and its principal, Yellen) recorded deeds of trust against the Land (e.g., the Zendejas Deed of Trust, the Allen & Vellone Deed of Trust and the CCV3 Deed of Trust) primarily or exclusively for the benefit of Yellen personally and Yellen's related entities – all at a time when the value of Land was far less than the amount owed to the Investors and at a time when several Investors were pursuing state court remedies to collect on their debts.  Such action clearly evidences wrongdoing by the Debtor (and its principal, Yellen).  Further, the Debtor filed its Chapter 11 bankruptcy at a time when Reineke, DeCelles and the Creditors had obtained significant judgments against the Debtor and the Creditors were pursing a claim for an accounting.

39.     The Debtor has no employees, no ongoing business operations, produces minimal cash flow and generates no meaningful income.  The Debtor has had no cash since 2007 and has been unable to obtain financing.  The Debtor's stated purpose, as found in the PPM, was to raise the $20 million to loan to HPR.  (Ex. 2, PPM, p. 18.)  The Debtor specifically represented in the PPM that it did not "intend to engage in, or pursue, any other business other than making the loan to Home Place, LLC [HPR] as disclosed herein."  (Ex. 2, PPM, p. 18 (alteration in original).)

40.     The Debtor's proposed liquidating "plan" does not contemplate that the Debtor will have any employees, cash flow or income upon a successful confirmation of the plan.  Instead, the Debtor's "plan" vaguely proposes to liquidate the Land at some unforeseen time in the distant future to some unknown third party.  There has to be something more than a vague plan for the development of its sole asset to avoid being in bad faith.  The "plan" is being utilized as nothing more than a means of delay and to prohibit Investors from exercising their state court remedies. The Debtor's lack of activity in the Chapter 11 case is further evidence of its intent to cause delay to the Investors.

41.     The Debtor filed bankruptcy Statements and Schedules that are inadequate and inaccurate.  The Debtor's lack of candor with its Investors and this Court in connection with its Statements and Schedules is further evidence of its lack of good faith.

42.     The Debtor's bankruptcy filing is not a legitimate attempt to reorganize under Chapter 11, but really a last-ditch attempt to forestall and frustrate the state court litigation.  Dismissal is appropriate to protect the jurisdictional integrity of the Bankruptcy Court.

43.     The Debtor is not a viable economic entity.  In addition to being insolvent, the Debtor

doesn't manufacture or sell a product and has no business to conduct.  The Debtor lacks the

ability to develop the Land.  It has no experience or expertise in developing land.  Even if it had

such expertise, it lacks the substantial funds necessary to complete the development of the Land.

All Debtor has is a pipe-dream of one day being able to somehow sell the Land to some

unknown third party.

44.      The Debtor's goal is purportedly to treat its Investors equally.  However, this goal does

not justify the Debtor's actions to frustrate certain Investors in asserting their state court

remedies.

45.     Debtor has a fiduciary duty to treat Investors fairly and equally, but that appears highly

unlikely.  Debtor's principal, Yellen, stated in the Creditors' meeting that it will seek to void the

Judgment Liens held by DeCelles and Creditors, but one must seriously doubt that the Debtor

will attempt to void the deeds of trust given to Yellen's lawyers and the deeds of trust given to a

cadre of Yellen's trusted Investors who hold the CCV3 Deed of Trust.  Debtor will undoubtedly

favor those entities and selectively seek to void the Judgment Liens held by his adversaries.  This

leads to the conclusion that the Debtor as a Debtor-in-Possession will not properly undertake its

fiduciary duties.

46.     The Investors do not benefit from this bankruptcy proceeding.  The Debtor's "plan" is no

plan at all – Debtor simply has a pipe-dream of somehow selling the Land 5-10 years from now.

Such a vague "plan" demonstrates the Debtor's lack of good faith.  Moreover, the Debtor plainly

filed the bankruptcy to stop Investors from pursuing their state court remedies.  The current legal

issues involved in this matter, e.g., DeCelles' fraudulent conveyance claim and the Creditors'
accounting claim, can and should be resolved in state court.  Therefore, dismissal of the Chapter
11 bankruptcy is in the best interest of the Debtor's creditors.

WHEREFORE, for reasons as set forth above, the Creditors respectfully request that the
Court enter an Order dismissing the within Chapter 11 bankruptcy case, and for such further
relief as is deemed appropriate by the Court.

Respectfully submitted this 6th day of October 2011.

USIAK LAW FIRM


By: \s\ Daniel K Usiak, Jr.
Daniel K. Usiak, Jr.
128 S Tejon St, Ste 202
Colorado Springs CO 80903
Telephone: 719-955-0143
Facsimile: 719-208-3290
Daniel@usiaklaw.com

15