UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| CROSSOVER FINANCIAL I, LLC, | ) | CASE NO. 11-24257 SBB |
| EIN:   20-3295455, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

**[PROPOSED] THIRD AMENDED DISCLOSURE STATEMENT TO ACCOMPANY
DEBTOR'S THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION
DATED JUNE 12, 2013**

Crossover Financial I, LLC, Debtor-in-Possession submits this Third Amended Disclosure Statement to accompany Debtor's Second Amended Chapter 11 Plan of Reorganization dated June 12, 2013 ("Plan").

## INTRODUCTION

This disclosure statement (the "Disclosure Statement") is being provided to all known creditors in the chapter 11 bankruptcy case of Crossover Financial I, LLC (the "Debtor"). This Disclosure Statement contains information about the Debtor and describes the Debtor's Third Amended Chapter 11 Plan of Reorganization dated June 12, 2013, filed by the Debtor on June 12, 2013. A full copy of the Plan is attached to this Disclosure Statement as **Exhibit A**. *Your rights may be affected. You should read the Plan and the Disclosure Statement carefully and discuss them with your attorney. If you do not have an attorney, you may wish to consult one.*

The proposed distribution under the Plan are discussed at pages 19 through 29 of this Disclosure Statement.

A.    **Purpose of the Disclosure Statement**

This Disclosure Statement is provided to disclose information which is deemed material, important and necessary for each creditor to arrive at a reasonable, informed decision in exercising the right to vote for acceptance or rejection of the Plan. The Disclosure Statement is subject to final approval pursuant to 11 U.S.C. §1125 by the United States Bankruptcy Court for the District of

Colorado which requires the Disclosure Statement to contain adequate information for the purposes of voting.  The Disclosure Statement describes:

- • The Debtor and significant events during the bankruptcy case;
- • How the Plan proposes to treat claims or equity interests of the type you hold (*i.e.* what you will receive on your claim or equity interest if the Plan is confirmed);
- • Who can vote or object to the Plan;
- • What factors the Bankruptcy Court (the "Court") will consider when deciding whether to confirm the Plan;
- • Why the Debtor believes the Plan is feasible and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation; and
- • the effect of confirmation of the Plan.

Be sure to read the Plan as well as the Disclosure Statement.  This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights.


**B.     Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**


1.     *Time and Place of Hearing to Confirm the Plan*

The hearing at which the Court will determine whether to confirm the Place has been scheduled for **_____, 201__, at _____ ___.m., in Courtroom C-402, Byron Rogers Courthouse, 1929 Stout Street, Denver, Colorado.**

2.     *Deadline For Voting to Accept or Reject the Plan*

If you are entitled to vote to accept or reject the Plan, vote on the enclosed ballot and return the same to **Nicholls & Associates, P.C., counsel for Crossover Financial I, LLC, at 1850 Race Street, Denver, Colorado 80206.**  See section IV.A. below for a discussion of voting eligibility requirements.

Your ballot must be received on or before **5:00 p.m. on _____, 201__**or it will not be counted.

3.     *Deadline for Objecting to the Confirmation of the Plan*

Objections to the confirmation of the Plan must be filed with the Court and served upon Debtor's counsel, the Office of the United States Trustee and interested parties by **_____, 201__**.

4.    *Identity of Person to Contact for More Information*

If you want additional information about the Plan, you should contact Stephen C. Nicholls, Nicholls & Associates, P.C., 1850 Race Street, Denver, CO 80206.

C.    **Disclaimer**

NO REPRESENTATIONS ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE WHICH ARE OTHER THAN AS CONTAINED IN THIS STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION. SIMILARLY, THE COMMISSION HAS NOT REVIEWED THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT.

The information contained herein has not been subjected to a certified audit.  The Debtor is not able to warrant or represent that the information contained herein is without error, although all reasonable efforts under the circumstances have been made to ensure accuracy.  Much of the information contained herein is based upon statements of other persons and information contained in other documents, the accuracy of which may be subject to interpretation and/or challenge.

The information contained in this Disclosure Statement is information available as of June 30, 2011, except as noted otherwise herein.  Changes may be necessary and any material changes may be considered by the Court at the hearing on confirmation of the Plan.  Financial information supplied by the Debtor has not been subject to audit.

**The Court has approved this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms.  The Court has not yet determined whether the Plan meets the legal requirements for confirmation, and the fact that the Court has approved the Disclosure Statement  does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted**.

D.    **Recommendation of the Debtor**

In the opinion of the Debtor, the Plan is the best available option for creditors.  The Plan provides the orderly liquidation of property of the estate and for the payment of creditors in fair and equitable manner.  The Plan minimizes administrative expenses that would be incurred through a Chapter 7 liquidation.  However, the Debtor makes no recommendation as to acceptance of the Plan and urges all creditors to vote on the Plan after their own careful analysis.

-3-

## II.   BACKGROUND

### A.   Description and History of Debtor's Business

The Debtor, Crossover Financial I, LLC, is a Colorado limited liability company formed on August 12, 2005.  Mitchell B. Yellen is the manager and sole member.  The company was formed for the purpose of raising funds through a Private Placement Memorandum ("PPM") to be loaned to an entity known as HPR, LLC ("HPR"), in connection with the acquisition and development of approximately 440 acres of real property located ("Real Property") in El Paso County, Colorado described as follows:

PARCEL A

THE SOUTHWEST QUARTER AND THE WEST HALF OF THE SOUTHEAST QUARTER OF SECTION 19, TOWNSHIP 11 SOUTH, RANGE 66 WEST OF THE 6TH P.M., COUNTY OF EL PASO, STATE OF COLORADO.

PARCEL B

THE EAST HALF OF THE OF THE SOUTHEAST QUARTER OF SECTION 24, TOWNSHIP 11 SOUTH, RANGE 66 WEST OF THE 6TH P.M., COUNTY OF EL PASO, STATE OF COLORADO.

PARCEL C

THE NORTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 25, TOWNSHIP 11 SOUTH, RANGE 66 WEST OF THE 6TH P.M., COUNTY OF EL PASO, STATE OF COLORADO.

PARCEL D

THE NORTH HALF OF THE NORTHWEST QUARTER OF SECTION 30, TOWNSHIP 11 SOUTH, RANGE 66 WEST OF THE 6TH P.M., COUNTY OF EL PASO, STATE OF COLORADO.

EXCEPT ANY PORTION OF THE ABOVE DESCRIBED TRACTS CONTAINED WITH HIGBY ROAD AS SET FORTH IN RESOLUTION NO 05-241 RECORDED JUNE 21, 2005 UNDER RECEPTION NO. 205092635 AND CONVEYED IN WARRANTY DEED RECORDED JUNE 21, 2005 UNDER RECEPTION NO. 205092636

Originally, it was contemplated that the Debtor's activities would be limited to lending the funds raised through the PPM to HPR.

Through the PPM, the company issued 108 promissory notes in the aggregate amount of $21,542,000.00, primarily in 2005 and 2006.  The holders of the promissory notes ("Noteholders") represent the majority of the Debtor's creditors.

Funds raised through the PPM were loaned to HPR and evidenced by a promissory note dated December 13, 2005, in the principal amount of $20,000,000.00.  HPR also executed two additional promissory notes of the same date in the amount of $200,000.00 each.  The promissory

notes were secured by a Deed of Trust executed by HPR granting the Debtor a security interest in the real property. As set forth in the Debtor's financial statement attached hereto as Exhibits B through D, approximately $20,991,000 was advanced to HPR. Additional funds were used to pay legal costs associated with the PPM and loan origination fees.

HPR consisted of three members: Colorado Commercial Builders, Inc (37.5%); DJT, LLC (20.0%); and Yellen Family Partnership, LLLP (42.5%). Mitchell Yellen held an interest in the Yellen Familiy Partnership, LLLP, as more fully disclosed in the PPM.

The HPR note included conditional personal guarantees executed by P. Dale Beggs, Mitchell Yellen and Dale Turner which provided for the release of the guarantees upon receiving all entitlements for at least 55% of the Lots to be developed on the Property. All entitlements shall be deemed to be obtained upon receipt of the final plat approval by all appropriate planning authorities.

The loan proceeds were used by HPR to acquire the real estate, pay closing costs associated with the purchase, to repay existing indebtedness, to pay loan fees, interest and for development costs and other expenses. HPR used a portion of the proceeds from the loan to service the debt owed to the Debtor. In turn, the Debtor paid interest to Noteholders in the approximate amount of $3,500,000. It was understood and disclosed in the PPM that HPR's ability to service its debt was dependant upon the success of the development project.

On April 2, 2007, the Town of Monument passed two ordinances, Ordinance 14 - 2007 and Ordinance 15- 2007 with respect to the property known as Home Place Ranch. Ordinance 14 - 2007 was entitled "An Ordinance Approving a Preliminary/Final Plat for Home Place Ranch." Ordinance 15 - 2007 was entitled "An Ordinance Approving a Preliminary/Final PD Site Plan for Home Place Ranch." Each of the ordinances were subject to conditions. Copies of the Ordinances are attached hereto as **Exhibit E.**

At the time is was estimated additional funds of approximately $3 to $4 million would be required to complete the conditions. The major costs were associated up front fees required by Triview Metropolitan District.

It is generally accepted that the "Great Recession" began in approximately December 2007. By the summer of 2007 and going into the fall of 2007 the struggling economy was beginning to adversely effect the residential real estate development market. Several potential developers pulled out of the project and efforts to generate additional funds were abandoned. There has been no further development activity on the Real Property since 2007.

HPR defaulted on its obligations to the Debtor in the later part of 2007. After the HPR default the Debtor could not pay the required interest to Noteholders and the promissory notes went into default in approximately December 2007.

Faced with the prospect of a lengthy foreclosure proceeding, the Debtor entered into to an agreement with HPR whereby the Real Property was transferred to the Debtor by way of a deed-in-

lieu of foreclosure. The transfer allowed the Debtor to avoid a delay of approximately 8 months to a year to obtain title to real estate through a foreclosure process. Upon acquiring the Real Property, the Debtor attempted to bring in additional developers to continue the project but those efforts were unsuccessful.

At the time of the default, HPR had paid interest on the note in the approximate amount of $3,090,618. The outstanding principal amount on the note was still owed. The deed-in-lieu of foreclosure agreement provided for the release of the personal guarantees. Prior to the filing of the bankruptcy, the DeCelles Creditors brought claims against the guarantors. Each of the guarantors filed motions for summary judgment based on various theories including the conditions required for the release of the guarantees had been met. The court found "...there exist disputed issues of material fact regarding whether the Town of Monument and other appropriate planning authorities have given final plat approval for the Project." Summary judgment on the basis that the DeCelles Creditors lacked standing as third party beneficiaries of the guarantees or that the claims were barred by the Statute of Frauds was also denied. However, the court noted: "[the] factual findings are preliminary in nature and derived utilizing the applicable summary judgment standards. To the extent there are issues of disputed fact, the ultimate facts will be resolved by the fact finder after the benefit of a trial." The DeCelles Creditors also asserted claims against Mitchell Yellen and Crossover for breach of fiduciary duty and securities fraud. Those two claims were withdrawn. Prior to trial, all claims were resolved pursuant to the terms of confidential settlement agreements.

Litigation was brought by Nolte Associates, Inc., arising from services provided in connection with the development project. A judgment was eventually obtained and a transcript of judgment was recorded against the Real Property on April 22, 2010. Colorado Capital Ventures, LLC, (CCV) an entity formed by certain Noteholders later acquired the judgment lien created by the recording of the transcript of judgment. Mr. Yellen is not a member or owner of any beneficial interest in CCV.

An additional law suit was commenced by Ross A. Reineke in approximately September 2009 seeking judgment on a promissory note. In that lawsuit, the Debtor unsuccessfully sought to have the holders of the other promissory notes joined as parties to the case.

As the Debtor was unable to generate cash to meet litigation expenses, it issued a Revolving Line of Credit Deed of Trust dated March 29, 2010, between Mitchell B. Yellen, Wealth Wonks Capital LLC and Crossover Financial I, LLC for the benefit of M. Jim Zendejas of Stinar & Zendejas, LLC in the amount of $130,000.00 which was initially recorded on April 16, 2010 and then re-recorded on April 26, 2010 at reception no. 210038241. At the time the promissory note was issued in favor of Stinar & Zendejas ("S&J") it was representing the Debtor in two district court civil actions and a separate appeal. The Debtor required representation in the matters but was unable to generate cash to pay for the services. The Debtor owed the firm approximately $175,000 in fees and the issuance of the promissory was supported by adequate consideration. S&J was also owed significant sums by both Yellen and Wealthwonks Capital, LLC for services provided to those entities. Yellen and Wealthwonks Capital, LLC , were parties to the note but services provided to Wealthwonks and Yellen were not satisfied through the issuance of the Crossover note and Deed

-6-

of Trust and those obligations were not effected by the issuance of the Deed of Trust.  The S&J note and Deed of Trust was later acquired by Colorado Capital Ventures, 2, LLC ("CCV2"), and as part of that transaction, additional amounts owed by the Debtor to S&J were released.

In addition, the Debtor issued a Deed of Trust dated June 17, 2010 between Crossover Financial I, LLC for the benefit of Allen & Vellone, P.C. in the amount of $90,000.00 recorded on June 21, 2010 at reception no. 210058205.  The promissory note to Allen & Vellone, P.C. was likewise issued by the Debtor in connection with legal services provided to the Debtor as a result of it's need for legal services and the inability to make cash payments for the same.

A third Deed of Trust dated June 23, 2010 between Crossover Financial I, LLC for the benefit of the 108 Noteholders in the amount of $21,542,000.00 was recorded on June 25, 2010 at reception no. 210060614 and re-recorded on March 21, 2011 at reception no. 211028297 to correct a copying error whereby certain names were cut off from Exhibit B listing the beneficiaries of the Deed of Trust. The Deed of Trust was granted to the Noteholders to secure the obligations arising from the promissory notes. Prior to the granting of the Deed of Trust the obligations were secured by a pro rata interests in the membership interest in the Debtor held by Mitchell Yellen. The Debtor was solely liable for the obligations.

Finally, a fourth Deed of Trust dated February 22, 2011 between Crossover Financial I, LLC and Colorado Capital Ventures 3, LLC in the amount of $250,000.00 recorded on March 4, 2011 at reception no. 211023152 in connection with an agreement with Colorado Capital Ventures 3, LLC ("CCV3") to provide funds to the Debtor to meet ongoing expenses up to an amount not to exceed $250,000.00.

## B.      Events Leading to Chapter 11 Filing

At the time the bankruptcy case was filed the following secured claims were asserted the estate:

| Creditor | Basis of Claim | Priority | Amount of Claim |
|---|---|---|---|
| Colorado Capital Ventures, LLC | Transcript of Judgement (4/22/10) | First | $498,955.08 |
| Colorado Capital Ventures 2 LLC | Deed of Trust (4/26/10) | Second | $162,450.81 |
| Allen & Vellone, P.C. | Deed of Trust (6/22/10) | Third | $90,000.00 |
| Noteholders | Deed of Trust (6/25/10) | Fourth | $21,452,000.00 |
| Ross A. Reineke | Transcript of Judgment (8/25/10) | Fifth | $630,248.27 |
| Colorado Capital Ventures 3, LLC | Deed of Trust (3/4/11) | Sixth | $16,184.34 |
| DeCelles Trust | Transcript of Judgment (3/28/11) | Seventh | $1,681,856.87 |
| First Regional Bank (DeCelles) | Transcript of Judgment (3/28/11) | Eighth | $1,237,975.40 |

| Creditor | Basis of Claim | Priority | Amount of Claim |
|---|---|---|---|
| William R. and Geri A. Bowman | Transcript of Judgment (5/18/11) | Ninth | $576,543.88 |
| Bruce D. and Nancy J. Hacker | Transcript of Judgment (5/18/11) | Ninth | $396,529.42 |
| H. Thomas Hall | Transcript of Judgment (5/18/11) | Ninth | $425,473.61 |
| Louise M. Hall | Transcript of Judgment (5/18/11) | Ninth | $156,035.34 |
| Donna M. Harmon | Transcript of Judgment (5/18/11) | Ninth | $1,440,601.67 |
| James B. House | Transcript of Judgment (5/18/11) | Ninth | $504,466.07 |
| Curtis Massey | Transcript of Judgment (5/18/11) | Ninth | $439,986.24 |
| Kathleen M. Barton | Transcript of Judgment (5/18/11) | Ninth | $468,896.82 |
| Integrity Bank & Trust f/b/o IBAT | Transcript of Judgment (5/18/11) | Ninth | $562,142.37 |
| Stephen L. Schwartzbach | Transcript of Judgment (5/18/11) | Ninth | $1,693,285.19 |

In addition, judgments were obtained by the holders of an additional 68 promissory, however, the bankruptcy case was filed before a transcript of those judgments was recorded against the Real Property.

A second lawsuit was commenced by The DeCelles Trust and Philip DeCelles seeking to avoid the Deed of Trust issued for the benefit of the Noteholders, as well as the other Deeds of Trusts granted by the Debtor under the Colorado Uniform Fraudulent Transfer Act.

As the Debtor did not have the resources to continue to defend the various lawsuits, protection was sought under the Bankruptcy Code to allow for the orderly liquidation of the Real Property and to insure the fair and equitable treatment of it's creditors.

C.      **Management of the Debtor Before and During the Bankruptcy.**

Mitchell B. Yellen is the manager and sole member of the Debtor.  Mr. Yellen is not receiving compensation from the Debtor.  Upon confirmation of the Plan, the debtor's assets will be transferred to a liquidating trust.  Mr. Yellen's membership interest in the Debtor will be cancelled.  Mr. Yellen will not receive or retain under the plan on account of the membership interest any property.

As disclosed in the PPM, Mitchell B. Yellen owned and controlled Wealth Wonks Capital, LLC, which was paid loan servicing fees in connection with the offering.  Wealth Wonks Capital, LLC, received compensation for servicing the loans as disclosed in the PPM.

Mitchell B. Yellen holds no interest Colorado Capital Ventures, LLC, Colorado Capital Ventures 2, LLC of Colorado Capital Ventures 3, LLC.

D.    **Significant Events During the Bankruptcy Case**

The Debtor filed its petition for relief on June 15, 2011, 79 days after the DeCelles Creditors filed their transcripts of judgment and 28 days after Bowman Creditors filed a transcript of judgment. The filing of the case was timed to preserve the ability to avoid the judicial liens created by the filing of the transcripts of judgment as preferential transfers under Section 547 of the Bankruptcy Code.

On September 20, 2011, DeCelles Creditors filed a motion to dismiss the bankruptcy case. The Bowman Creditors filed a separate motion to dismiss on October 6, 2011. Ross A. Reineke has joined in the motions. Generally, the motions allege the Debtor's bankruptcy case was filed in bad faith, primarily because litigation was pending in state court at the time the case was filed. Objections to motions were filed by the Debtor and a group of 68 other Noteholders.

A hearing was scheduled for November 1, 2011 on the motion to dismiss filed by the Bowman Creditors. Prior the hearing, the Debtor filed its initial Plan of Reorganization and proposed Disclosure Statement on October 28, 2011. On October 12, 2011, the Debtor filed adversary proceedings against the DeCelles Creditors and Bowman Creditors seeking to avoid their respective judicial liens. On October 20, 2011, the Debtor filed an application seeking to employ Karen McClaflin as a real estate broker for the estate.

At the hearing, the parties agreed to set the motions to dismiss for an evidentiary hearing scheduled for March 15, 2012.

On December 29, 2012, the DeCelles Creditors filed a second motion to dismiss based on the argument that Mitchell Yellen did not have the requisite authority to file the Debtor's bankruptcy case. Again, Mr. Reineke joined the second motion to dismiss.

The parties agreed to prosecute the second motion to dismiss first as the granting of the requested relief would render the other matters moot. An evidentiary hearing upon stipulated facts was conducted on May 21, 2012. After taking the matter under advisement, the Bankruptcy Court denied the motion to dismiss by Order dated July 2, 2012.

The DeCelles Creditors and Mr. Reineke filed separate appeals of the Bankruptcy Court's decision. Both appeals were dismissed on jurisdictional grounds on August 22, 2012.

At this time, the first motion to dismiss filed by the DeCelles Creditors and joined by Mr. Reineke remains pending, however, no action has been taken to continue prosecution of the motion. The motion to dismiss filed by the Bowman Creditors has been withdrawn. The Debtor does not believe the pending motion has merit. The primary effect of dismissal of the bankruptcy case would

serve to insulate the DeCelles Creditors' judicial liens as well as the Bowman Creditors' judicial lien from avoidance as preferential transfers under the Bankruptcy Code.

Dismissal would also subject all of the creditors of the estate to continuing litigation in state court. The continuation of that litigation is not in the best interest of the creditors of the estate.

> What constitutes "cause," including bad faith, for the dismissal of a Chapter 11 petition is a matter of judicial discretion under the circumstances of each case. See, e.g. *In re Hoff*, 54 Bankr. 746, 754 (Bankr. D.N.D. 1985) and 11 U.S.C. § 1112(b). Moreover, the Bankruptcy Court is one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws. *In re Professional Sales Corp*., 48 Bankr. 651, 658 (Bankr. N.D.Ill. 1985) and 11 U.S.C. § 105. One of the primary purposes of Chapter 11 of the bankruptcy laws is the provision of time for debtors to implement plans of payment to creditors without the burden of impending litigation. *See, e.g. In re Talladega Steaks, Inc., supra*.
>
> ...
>
> Although the Court is not unsympathetic to the plight of the Movants in attempting to enforce their judgment, it is bound to consider the interests of the other creditors of this trust and protect whatever equities the trust may have for their benefit. In making such considerations, it appears to this Court that to lift the stay or to dismiss the trust's Chapter 11 Petition and allow the Movants to proceed against its assets would be to the detriment of the other creditors. It further appears that appointment of a Chapter 11 Trustee would work to diminish the interests of all creditors, including the Movants, at this time.

*In re Cooper Properties Liquidating Trust, Inc*., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986)

It is the Debtor's position, that it should be allowed to present its Plan of Reorganization to the creditors for voting and it the event a plan cannot be confirmed, conversion to Chapter 7 as opposed to dismissal is in the best interest of the creditors of the bankruptcy estate.

The Debtor withdrew its application seeking to employ Karen McCaflin and filed a motion to employ Matt Call of Navpoint Real Estate Group as a real estate broker for the estate. A later amended motion was also filed. Objections to both motions were filed by Mr. Reineke and The DeCelles Creditors. The application is still pending, however, as set forth in the Plan, the Debtor has received an offer for the purchase of the Real Property from Rivers Development, Inc., that does not provide for broker commissions.

Navpoint has completed the following marketing and research:

-10-

- Compiled comparable data and developed a comprehensive Broker Opinion of Value.[1]

- Developed a multi-page marketing package that features the benefits of Home Place Ranch and the surrounding community.

- Generated a list of 100+ local, regional, and national homebuilders and land investment companies that are currently active in the marketplace, mailed a full color marketing package to each company and followed up with phone calls. The feedback received was generally that builders are looking for developments where they can purchase smaller groups of finished lots. Woodmont Development, a company that develops residential lots to sell to local builders, indicated there were only 1100 permits pulled in 2011 in El Paso County and until this number approaches 3000 permits/year Home Place Ranch will be difficult to sell.

- Full web exposure with advertising on the NavPoint Real Estate Group website as well as the following commercial database exchanges: Xceligent, Loopnet, Colorado Springs Commercial Properties, CoStar, CIMLS.com, Officespace.com, Catalyst, Commercialsource.com, Globalbroker.com, Commercial IQ, RoFo, LinkedIn, PropBot, Sibdu, Oodle Classifieds, Lycos Classifieds, Vast Classifieds and USBizTrader.

- Print advertising in the Colorado Real Estate Journal.

- Ordered and installed signage on the property that is specific to Home Place Ranch.

- Monthly email campaign to the Real Estate Brokerage Community.

- Set up and attended meetings with the Town of Monument Development Services Department to determine the current status of the development and to solicit input on phasing ideas.

- Attended all of the monthly Triview Metropolitan District Board Meetings to develop relationships and solicit input on phasing ideas and options for the development.

A summary of prior marketing efforts is attached hereto as **Exhibit F**.

The general consensus from feedback received to date is that the property would attract more interest if it were sold in smaller pieces through phasing and/or option contracts. Navpoint also indicated it would be beneficial to seek the assistance of a consultant to determine remaining development items and the costs associated therewith.

Over the last few months, the Debtor has explored the possibility of further development of the property. When the real estate market crashed in 2007 and 2008 several development projects

---

[1]     The Broker Opinion of Value set forth a value for the real estate of between $13,495,000 and $13,995,000. A copy of the BOV is available upon request from undersigned counsel.

in the general also stalled. As the market has begun to rebound, building in the area has restarted. The project directly adjacent to the Real Property, Promontory Point, is aggressively building and selling homes.

In the current state of the market, builders have been able to acquire lots that are either ready for construction or further developed. With the new building and sale of residential properties the inventory of finished lots is decreasing.

The Debtor began negotiations with Schuck Communities regarding the potential of creating a joint venture or other vehicle to develop and sell lots, however those negotiations were unsuccessful.

The Debtor has also met with private venture capital providers regarding acquiring cash to fund further development and met with disinterested development management professionals regarding consultation services.

Both potential lenders and consultants were unwilling to proceed without a confirmed Chapter 11 Plan of Reorganization.

Through the course of marketing the Debtor received one Letter of Intent to purchase the real estate over three years. The proposed purchase price was $6,405,000.00 and provided for the acquisition of the property in thirds over a three year period.

In April 2013, the Debtor entered into a purchase and sale contract with Rivers Development, Inc., contingent upon Bankruptcy Court approval which provides for a minimum purchase price of $12,675,000 over a period of approximately nine (9) years. That contract has been revised and the exact terms of the sale are set forth in the Debtor's Plan, attached hereto as **Exhibit A**.

E.      **Projected Recovery of Avoidable Transfers**

The Debtor has commenced two adversary proceedings seeking to avoid the judicial liens obtained by the DeCelles Creditors and the Bowman Creditors within the 90 immediately preceding the filing of the bankruptcy case as preferential transfers under 11 U.S.C. §547, however, no monetary claims have been asserted in those actions.

Various creditors, in particular the DeCelles Creditors, have alleged that various transfers made by the Debtor are subject to avoidance. Upon the filing of a bankruptcy case, standing to pursue avoidance actions vests in the Trustee. In a Chapter 11 case the standing is held by the Debtor-in-Possession. See, Summers v. Perkins, 81 P.3d 1141, 1142 (Colo. Ct. App. 2003). In evaluating the claims, in addition to examining whether potential litigation benefits the creditors estate the Debtor has also looked at factors including the cost of pursuing the litigation, the possibility of being able to collect on any eventual judgment obtained in the litigation, and the

-12-

probability of success on the merits after consideration of potential defenses.  The various claims are addressed as follows:

**Stinar & Zendejas Deed of Trust**

As set forth above, the Debtor, together with Mitchell Yellen and Wealthwonks Capital, LLC, executed a promissory note (line of credit) in the amount of $130,000 that was secured by a Deed of Trust against the real estate.   At the time the promissory note was issued in favor of Stinar & Zendejas ("S&J") it was representing the Debtor in two district court civil actions and a separate appeal.  The Debtor required representation in the matters but was unable to generate cash to pay for the services.  The Debtor owed the firm approximately $175,000 in fees and the issuance of the promissory note was supported by adequate consideration.  S&J was also owed significant sums by both Yellen and Wealthwonks Capital, LLC for services provided to those entities.   Services provided to Wealthwonks and Yellen were not satisfied through the issuance of the Crossover note and Deed of Trust.   The S&J note and Deed of Trust was later acquired by Colorado Capital Ventures, 2, LLC ("CCV2"), and as part of that transaction, additional amounts owed by the Debtor to S&J were released.   CCV2 filed Proof of Claim numbered 14 in the amount of $162,450.81, inclusive of interest.  Mr. Yellen is not a member or owner of any beneficial interest in CCV2.  S&J has provided the Debtor a summary of outstanding invoices in the aggregate amount of $214,735.82 representing services provided to the Debtor under the revolving line of credit.  Because value of the services provided to the Debtor exceeded the amount of the obligation secured by the Deed of Trust, reasonably equivalent value was received in exchange for the transfer and the Deed of Trust is not avoidable under 11 U.S.C. §548.

**Allen & Vellone Deed of Trust**

As with S & J, the Debtor executed a promissory note  Allen & Vellone, P.C. was likewise issued by the Debtor in connection with legal services provided to the Debtor because of the inability to make cash payments for the same.  Allen & Vellone has not filed a Proof of Claim in the case.  Allen & Vellone was listed in the Debtor's schedules as holding a claim that was not contingent, unliquidated or disputed and under applicable bankruptcy rules is not required to file a Proof of Claim. Allen & Vellone has provided documentation to Debtor evidencing the amount of $85,711.96 and the claim will be allowed in that amount.  Reasonably equivalent value was received in exchange for the transfer and the Deed of Trust is not avoidable under 11 U.S.C. §548.

**Noteholders Deed of Trust**

On June 25, 2010 the Debtor issued a promissory note in favor the holders of the 108 promissory notes issued by the Debtor, including the DeCelles Creditors, in the aggregate amount of $21,542,000.00.  The note was secured by a Deed of Trust recorded with the El Paso County, Colorado Recorder's Office on June 25, 2010 at reception no. 210060614.  Attached to the Deed of

-13-

Trust was Exhibit B, a numbered list of beneficiaries. Due to a copying error, the beneficiaries listed at the bottom of each page of the exhibit were cut off (beneficiaries numbered 14 (partial), 15, 16, 33, 34, 46 (partial), 47, 60, 61, 73, 74, 85 (partial), 86, 87 (partial), 98 and 99). A corrected Deed of Trust, with the complete Exhibit B, was re-recorded on March 21, 2011. The Debtor does not believe the error in the original Deed of Trust effects the validity following the rationale set forth in In re Taylor, 422 B.R. 270, 274 (Bankr.D.Colo. 2009)(The issue is whether the Deed of Trust provided sufficient notice that a title searcher or prospective purchaser would be required to conduct further inquiry). The obvious omission of numbered beneficiaries would necessitate further inquiry.

The DeCelles Creditors argue that such obligation was in violation of the Colorado Uniform Fraudulent Transfer Act as the security interest was "granted to the Noteholders without any additional consideration..." It is undisputed that all of holders of the promissory notes provided funds to the Debtor in connection with the PPM in amounts equal to the respective promissory notes. C.R.S. 38-8-104 provides: "(1) Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an *antecedent debt is secured* or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person." (Emphasis added). C.R.S. 38-8-106 (2) provides an exception if the transfer is made to an insider on account of antecedent debt. The respective Noteholders are not insiders of the Debtor and no such allegation has been made.

Mr. Rieneke has alleged that the granting of the Deed of Trust was done with the actual intent to defraud creditors. The Debtor denies this allegation and submits the argument ignores the fact the transfer was made to benefit of the Debtor's creditors.

Moreover, in evaluating the claim, the Debtor holds a fiduciary duty to act in the best interest of the creditors of the estate. Prosecution of the litigation would inure only to the benefit of Mr. Reineke and to the direct detriment of all other Noteholders. Mr. Rienke obtained a judicial lien against the Debtor's real estate in August 2010, outside of the applicable preference period.

Avoidance of the Deed of Trust would result in Mr. Rieneke being paid in full while all other Noteholders would receive a reduced pro rata distribution. Even if the claim could be successfully pursued, which the Debtor believes is unlikely, pursuit of the litigation is not in the best interest of the creditors of the estate.

## CCV 3 Deed of Trust

On February 22, 2011, the Debtor entered in a agreement with Colorado Capital Ventures 3, LLC (CCV3) to provide funds to the Debtor to meet ongoing expenses up to an amount not to exceed $250,000.00. The obligation was secured by Deed of Trust against the property. CCV2 filed Proof of Claim numbered 12 in the amount of $16,184.34, inclusive of interest, representing funds advanced to the Debtor under the agreement. Under the Debtor's Plan the secured claim is being

-14-

treated as entirely unsecured as a result of its junior position. No benefit to the estate would result from prosecution of an avoidance action. Mr. Yellen is not a member or owner of any beneficial interest in the entity.

**Deed in Lieu Agreement**

In pleadings filed with the Bankruptcy Court, the DeCelles Creditors have argued that claims arising from a Deed in Lieu of Foreclosure Agreement constitute "a major asset of the estate." In essence, the DeCelles Creditors allege that the agreement can be attacked as a fraudulent transfer because personal guarantees of Mitchell Yellen, Dale Beggs and Dale Turner were released as part of the agreement. The DeCelles Creditors have furthered argued the agreement present a conflict of interest for Mr. Yellen acting as a fiduciary for Crossover.[2]

The Deed in Lieu of Foreclosure Agreement allowed Crossover to obtain title to the property without the necessity of foreclosure. The Agreement also provided for the release of the personal guarantees. In general terms, to avoid the agreement as a fraudulent transfer, it would have to proved that the adequate consideration was not received in exchange by Crossover from HPR under the agreement.

The DeCelles creditors argue because the Mr. Yellen's guaranty was released as part of the agreement, a conflict of interest exists with him serving as a fiduciary of the bankruptcy estate. To date however, neither the DeCelles Creditors or any other party in interest has attempted to remove Mr. Yellen by filing a motion to appoint a trustee as required under 11 U.S.C. §1104(a)(4), or to convert the case to a Chapter 7 case under the provisions of 11 U.S.C. §1112.

Section B.4. of the PPM disclosed: Conflicts of Interest. Mitchell B. Yellen the Manager of the Company, has ownership interests and participates in the management of other entities which are involved, directly or indirectly, in the acquisition and development of the subject real estate including, without limitation, Wealth Wonks Capital, LLC and Home Place, LLC. In addition, Mr. Yellen has prior business relationships with the persons who are the principal members in Home Place, LLC. In connection with such business relationships, Mr. Yellen has provided substantial personal guarantees. Accordingly, there are inherent conflicts of interest, including time, effort, fairness of transactions and business opportunity, involved in the participation by Mr. Yellen in other business activities either similar to the Company's or which contract with the Company.

---

[2]     Prior to the filing of the bankruptcy, the DeCelles Creditors  commenced litigation against the Debtor as well as P. Dale Beggs, Dale R. Turner, and the Debtor's sole member, Mitch Yellen, Case No. 10CV2880, District Court, El Paso County, Colorado.  In the litigation he DeCelles Creditors advanced claims against the individual Defendants arising from the release of the personal guarantees executed in connection with the Debtor's loan to HPR which were released in connection with a Deed in Lieu agreement entered into between the Debtor and HPR.  Those claims have been settled, and dismissed, with prejudice, pursuant to the terms of a confidential settlement agreement.

-15-

The Debtor believes the alleged claims have significant problems.  First, there is a question as to whether the guarantees with released regardless of the Deed in Lieu of Foreclosure Agreement. As disclosed in the PPM, the guarantees were conditional and were to be released  upon the receipt of all entitlements for at least 55% of the Lots to be developed on the Property.  The PPM disclosed all entitlements shall be deemed to be obtained upon receipt of the final plat approval by all appropriate planning authorities.  An affidavit dated November 10, 2010, of Gary Shupp, attorney for the Town of Monument states: "On the 2nd day of April 2007, the Town of Monument Board of Trustees passed Ordinance 15-2007 wherein it approved for HPR, LLC, its Preliminary/Final Plat." (See also, Exhibit E).

In the state court litigation previously brought by DeCelles Creditors the guarantors sought summary judgment on the issue that the conditional release was met.  In denying summary judgment the Court found:

> "...the Court concludes there are disputes with respect to a number of facts that are material to the question of whether HRP has "received all entitlements for at least fifty-five percent (55%) of the Lots to be developed on the Property."  The competing affidavits of the representatives of the Town of Monument are illustrative. Mr. Shupp seems to opine that the Final Plat for the Project has been approved by the Town.  At other points, however, he acknowledges there are conditions which are yet to be fulfilled and the Final Plat cannot be deemed approved until these conditions have been met.  The Town Planner, Ms. Griffin, opines the Final Plat has not yet been approved because of the unmet conditions."

While the Court determined factual disputes existed with respect as to whether the conditions had been met for the release of the guarantees precluding summary judgment, no judicial determination was ever made that the conditions were not met.  The claims being advanced in the litigation by the DeCelles creditors were settled and dismissed, with prejudice, prior to any formal judicial determination of the issue.

Moreover, the deed-in-lieu agreement was entered into in November 2007.  Earlier in the year, in March 2007, the Debtor obtained an appraisal of the property concluding the market value of the real estate was $26,050,000.  A value that exceeded the amount due under the note. The DeCelles Creditors argue that Mr. Yellen had expressed doubts as to the reliability of the appraisal. Nevertheless, to be avoided, it would have to proved that value received in exchange was not reasonable.

In addition, the agreement allowed Crossover to obtain title to the property without the delay of foreclosure allowing efforts to continue development to proceed.  At the time, no one could have predicted the depth and length of the recession ahead and the corresponding loss in real property values.

The Debtor believes that serious concerns exist concerning the probability of success on the merits.

In addition, the Debtor believes there is little probably of collection of judgment, if any, obtained. The claim, if successful, would expose the three individuals to personal liability for the all of the outstanding notes. The Debtor is informed and believes that personal bankruptcies would follow.

The Debtor does not intend to pursue the litigation and believes the costs and delay associated with the prosecution of the litigation outweigh any potential recovery.

**Claims of Bad Faith**

The DeCelles Creditors and Mr. Reineke have argued the Debtor's bankruptcy case and Plan of Reorganization have been filed in bad faith. The Debtor denies these claims. The Plan proposes to pay all of the Noteholders in a fair an equitable manner. The Debtor believes the Chapter 11 Plan offers the best opportunity to maximize the value of the property and avoid additional administrative expenses that would be incurred in a Chapter proceeding.

**Appointment of a Chapter 11 Trustee**

The DeCelles Creditors and Mr. Reineke also sought to have the Bankruptcy Court consider the appointment of a Chapter 11 Trustee. The DeCelles Creditors and Mr. Reineke did not file a motion, with required notice, requesting such relief. The Bankruptcy Court denied the relief.

F.      **Claims Objections**

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtor reserves the right to object to claims. Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld. The procedures for resolving disputed claims are set forth in Article V of the Plan.

G.      **Current and Historical Financial Condition**

The Debtor's material assets are set forth below:

DIP Checking Account Balance (as of June 30, 2011):                    $9,740.81

Real Property (scheduled value)                                        $14,000,000.00

-17-

Residential Month to Month Lease                                            Unknown

Grazing Lease                                                               Unknown

Two residential units are located on the property, that one of the units is not habitable at the present time due to septic issues, the other unit is rented on a month-to-month basis with a rental rate of $1,500 per month, a grazing lease is in place that provides for quarterly fees in the approximate amount of $500 and that income generated from the leases is sufficient to meet the expenses associated with the maintenance of the real property, including real property taxes.

From the filing of the bankruptcy case through March 31, 2013, the Debtor's operating reports reflect:

Income:

Rents                                                                       $35,463.46

Expenses:

| | |
|---|---|
| Insurance | $4,007.00 |
| R.E. Taxes | $8,183.95 |
| Legal and Professional Fees | $15,500.00 |
| UST Fees | $1,950.00 |
| Bank Charges | $171.00 |

The Debtor's Plan provides for the sale of the Real Property. No operations are contemplated after the property is sold. It is contemplated from the proceeds of the sale of the property reserves will be established to cover the costs of insurance, real estate taxes, and administrative expenses.

A copy of the Debtor's pre-petition Detailed Profit & Loss Statement is attached hereto as **Exhibit B**; a copy of the Detailed Balance Sheet is attached hereto as **Exhibit C**; A copy of the Statement of Cash Flows is attached hereto as **Exhibit D**.


III.    **SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS**

A.    **What is the Purpose of the Plan of Reorganization?**

As required by the Code, the Plan places claims and equity interest in various classes and describes the treatment each class will receive. The Plan also states whether each class of claims or equity interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

B.    **Unclassified Claims**

Certain types of claims are automatically entitled to specific treatment under the Code.  They are not considered impaired, and holders of such claims do not vote on the Plan.  They may, however, object, if in their view, their treatment under the Plan does not comply with that required by the Code.   As such, the Plan Proponent has *not* placed the following claims in any class:

1.    *Administrative Expenses*

Administrative expenses are costs or expenses of administering the Debtor's chapter 11 case which are allowed under §507(a)(2) of the Code.  Administrative expenses also include any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy petition.  The Code requires that all administrative expenses be paid on the effective date of the Plan, unless a particular claimant agrees to a different treatment.

The following chart lists the Debtor's estimated administrative expenses, and their proposed treatment under the Plan

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Expenses Arising in the Ordinary Course of the Business After the Petition Date | $0.00 | Post-petition obligations incurred in the course of the Debtor's business affairs have been timely paid pursuant to the terms of the respective obligations.  To the extent that obligations are outstanding at the time of confirmation, they will be paid in full on the effective date of the Plan, or according to the terms of the obligation if later |
| The Value of Goods Received in the Ordinary Course of Business Within 20 Days before the Petition Date | $0.00 | No obligations of this nature exist |

-19-

| | | |
|---|---|---|
| Professional Fees approved by the Court | $75,000.00 (Estimated) | Paid in full on the effective date of the Plan, or according to separate written agreement, or according to court order if such fees have not been approved by the Court on the effective date of the Plan |
| Clerk's Office Fees | $0.00 | Paid in full on the effective date of the Plan |
| Other Administrative Expenses | $0.00 | Paid in full on the effective date of the Plan, or according to separate written agreement |
| Office of the U.S. Trustee Fees | $20,000.00 | Paid in full on the effective date of the Plan. Based on its current income and expenses, the Debtor is required to pay the minimal quarterly fee of $325 from revenues generated from the leases on the Real Property. Upon the sale of the Real Property, a quarterly fee in the amount of $20,000.00 will be payable if the gross proceeds of sale exceed $15,000,000.00, or $13,000.00 if the gross proceeds are less than $15,000,000.00. |
| TOTAL | $95,000.00 | |

2.    *Priority Tax Claims*

Priority tax claims are unsecured income, employment and other taxes described by §507(as)(8) of the Code. Unless the holder of such a §507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim, in regular installments paid over a period not exceeding 5 years from the order of relief.

The following chart lists the Debtor's estimated §507(a)(8) priority tax claims and their proposed treatment under the Plan:

| Description | Estimated Amount Owed | Date of Assessment | Treatment |
|---|---|---|---|

-20-

| None | | | |
|------|--|--|--|

## C.    Classes of Claims and Equity Interests

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

### 1.    *Classes of Secured Claims*

Allowed Secured Claims are secured by property of the Debtor's bankruptcy estate (or are subject to setoff) to the extent allowed as secured claims under §506 of the Code.  If the value of the collateral or setoffs securing the creditor's claim is less that the amount of the creditor's allowed secured claim, the deficiency will treated as a Class 11 claim.

The identity of the holders of claims in Class 5 is set forth in Article II of the Plan. The following chart lists all classes containing Debtor's secured pre-petition claims and their proposed treatment under the Plan:

| Class | Impairment | Treatment |
|-------|-----------|-----------|
| Class 2 - Secured Claim of Colorado Capital Ventures, LLC | Unimpaired | Colorado Capital Ventures, LLC, filed Proof of Claim numbered 13 in the amount of $500,455.08.  The claim was filed as a secured claim in the amount of $498,955.08 arising from the assignment of a transcript of judgment recorded on April 22, 2010, in the original amount of $448,346.03.  The claim also includes an unsecured amount of $1,500.00.<br><br>Pursuant to 11 U.S.C. §506(a) (1) "An allowed claim of a creditor secured by a lien on property in which the estate has an interest...is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property...and is an unsecured claim to the extent that the value of such creditor's interest...is less than the amount of such allowed claim.  11 U.S.C. §506(b) provides: "To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose." |

| Class | Impairment | Treatment |
|-------|------------|-----------|
|  |  | The secured claim represents the first priority lien against the Real Property.  The value of Real Property exceeds the amount of the secured claim. To the extent allowed, the Class 2 secured claim will be paid in full, including interest and other charges allowable under Section 506 of the Bankruptcy Code from the proceeds of the sale of the Real Property.<br><br>The Debtor reserves any rights it may have to file a objection to allowance of the claim if appropriate.  To the extent that any portion of the secured claim is disallowed, any such amount will be treated as a Class 11 Unsecured Claim.<br><br>The $1,500.00 unsecured amount set forth in the Proof of Claim will be treated as a Class 11 Unsecured Claim. |

| Class | Impairment | Treatment |
|-------|-----------|-----------|
| Class 3 - Secured Claim of Colorado Capital Ventures 2, LLC | Unimpaired | Colorado Capital Ventures 2, LLC, filed Proof of Claim numbered 14 in the amount of $162,450.81.  The claim was filed as a secured claim in the amount of $162,450.81 arising from the assignment of a Deed of Trust dated March 29, 2010, between Mitchell B. Yellen, Wealth Wonks Capital LLC and Crossover Financial I, LLC for the benefit of M. Jim Zendejas of Stinar & Zendejas, LLC in the amount of $130,000.00 initially recorded on April 16, 2010 and re-recorded on April 26, 2010, in the original amount of $130,000.00 for legal services provided to the Debtor.<br><br>Pursuant to 11 U.S.C. §506(a) (1) "An allowed claim of a creditor secured by a lien on property in which the estate has an interest...is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property...and is an unsecured claim to the extent that the value of such creditor's interest...is less than the amount of such allowed claim.  11 U.S.C. §506(b) provides: "To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose."<br><br>The secured claim represents the second priority lien against the Real Property.  The value of Real Property exceeds the amount of the secured claim. To the extent allowed, the Class 3 secured claim will be paid in full, including interest and other charges allowable under Section 506 of the Bankruptcy Code from the proceeds of the sale of the Real Property.<br><br>The Debtor reserves any rights it may have to file a objection to allowance of the claim if appropriate.  To the extent that any portion of the secured claim is disallowed, any such amount will be treated as a Class 11 Unsecured Claim. |

| Class | Impairment | Treatment |
|---|---|---|
| Class 4 - Secured Claim of Allen and Vellone, P.C. | Impaired | The claim of Allen & Vellone, P.C., was scheduled as a secured claim in the Debtor's schedules in the amount of $90,000.00 arising from a Deed of Trust dated June 17, 2010 between Crossover Financial I, LLC for the benefit of Allen & Vellone, P.C. in the amount of $90,000.00 recorded on June 21, 2010, for legal services provided to the Debtor. The claim was not scheduled as contingent, unliquidated or disputed by the Debtor. The claim will be allowed in the amount of $85,711.96.<br><br>The secured claim represents the third priority lien against the Real Property. The value of Real Property exceeds the amount of the secured claim. To the extent allowed, the Class 3 secured claim will be paid from the proceeds of the sale of the Real Property. The claim will not be entitled to interest or other amounts that may be allowable under Section 506 of the Bankruptcy Code because no Proof of Claim was timely filed.<br><br>The Debtor reserves any rights it may have to file a objection to allowance of the claim if appropriate. To the extent that any portion of the secured claim is disallowed, any such amount will be treated as a Class 11 Unsecured Claim. |

| Class | Impairment | Treatment |
|-------|------------|-----------|
| Class 5 - Secured Claim of Noteholders | Impaired | Class 5 claims consist of the claims of the holders of 108 promissory notes issued by the Debtor under a Private Placement Memorandum and secured by a Deed of Trust dated June 23, 2010 between Crossover Financial I, LLC for the benefit of the 108 Noteholders in the amount of $21,542,000.00 recorded on June 25, 2010 at reception no. 210060614 and re-recorded on March 21, 2011 at reception no. 211028297 to correct a copying error whereby certain names were cut off from Exhibit B listing the beneficiaries of the Deed of Trust.<br><br>The secured claim represents the fourth priority lien against the Real Property.  The principal amount of the Deed of Trust exceeds the fair market value of the Real Property.<br><br>Class 5 claimants shall receive the balance of the proceeds of sale of the Real Property on a pro rata basis of the principal amount of the respective promissory notes after the payment of unclassified administrative expenses and claims in Classes 2, 3, 4 and 5.<br><br>Pursuant to Section 506 of the Bankruptcy Code, to the extent that proceeds from the sale of the Real Property are insufficient to pay the principal amount of the promissory notes in full, any unpaid principal balance, together with accrued interest and other charges will be treated as a Class 11 Unsecured Claim. |
| Class 6 - Secured Claim of Ross A. Rieneke | Impaired | Ross A. Rieneke filed Proof of Claim numbered 15 in the amount of $630,248.27.  The claim was filed as a secured claim arising from a transcript of judgment recorded on August 25, 2010, in the original amount of $563,417.60, or alternatively, as a secured claim as a beneficiary of the Deed of Trust dated June 23, 2010.<br><br>The claim of Ross A. Rieneke as a beneficiary of the Deed of Trust dated June 23, 2010 is allowed as a Class 5 claim.<br><br>To the extent that the claim is asserted as arising from the judgment lien created upon the filing of the transcript of judgment, the fair market value of Real Property is less that the amount of the senior secured claims (Class 2 through Class 5) and pursuant to 11 U.S.C. §506, the balance of the claim not paid as a Class 5 claim will be treated as a Class 11 Unsecured Claim. |

| Class | Impairment | Treatment |
|---|---|---|
| Class 7 - Secured Claim of Colorado Capital Ventures, LLC | Impaired | Colorado Capital Ventures 3, LLC, filed Proof of Claim numbered 12 in the amount of $16,184.34.  The claim was filed as a secured claim arising from a Deed of Trust recorded on March 4, 2011.<br><br>The fair market value of Real Property is less that the amount of the senior secured claims (Class 2 through Class 6) and pursuant to 11 U.S.C. §506, the claim will be treated as a Class 11 Unsecured Claim. |
| Class 8 - Secured Claim of The DeCelles Trust | Impaired | The DeCelles Trust filed Proof of Claim numbered 11 in the amount of $1,681,856.67.  The claim was filed as a secured claim arising from a transcript of judgment recorded on March 28, 2011, in the original amount of $1,681,856.67, or alternatively, as a secured claim as a beneficiary of the Deed of Trust dated June 23, 2010.<br><br>The claim of The DeCelles Trust as a beneficiary of the Deed of Trust dated June 23, 2010 is allowed as a Class 5 claim.<br><br>To the extent that the claim is asserted as arising from the judgment lien created upon the filing of the transcript of judgment, the fair market value of Real Property is less that the amount of the senior secured claims (Class 2 through Class 7) and pursuant to 11 U.S.C. §506, the balance of the claim not paid as a Class 5 claim will be treated as a Class 11 Unsecured Claim. |
| Class 9 - Secured Claim of First Regional Bank, c/o Trust Administrative Services Corporation FBO Philip P. DeCelles | Impaired | First Regional Bank, c/o Trust Administrative Services Corporation FBO Philip P. DeCelles filed Proof of Claim numbered 10 in the amount of $1,237,975.40.  The claim was filed as a secured claim arising from a transcript of judgment recorded on March 28, 2011, in the original amount of $1,237975.40, or alternatively, as a secured claim as a beneficiary of the Deed of Trust dated June 23, 2010.<br><br>The claim of First Regional Bank, c/o Trust Administrative Services Corporation FBO Philip P. DeCelles as a beneficiary of the Deed of Trust dated June 23, 2010 is allowed as a Class 5 claim.<br><br>To the extent that the claim is asserted as arising from the judgment lien created upon the filing of the transcript of judgment, the fair market value of Real Property is less that the amount of the senior secured claims (Class 2 through Class 8) and pursuant to 11 U.S.C. §506, the balance of the claim not paid as a Class 5 claim will be treated as a Class 11 Unsecured Claim. |

| Class | Impairment | Treatment |
|---|---|---|
| Class 10 - Secured Claim of William R. Bowman and Geri A. Bowman; Bruce D. Hacker and Nancy J. Hacker; H. Thomas Hall and Lousie M. Hall; Donna M. Harmon; James B. House; Curtis Massey; Kathleen H. Barton; Integrity Bank and f/b/o "IBAT," a Colorado corporation; and Stephen L. Schwartzbach | Impaired | The holders of Class 10 claims:  William R. Bowman and Geri A. Bowman; Bruce D. Hacker and Nancy J. Hacker; H. Thomas Hall and Lousie M. Hall; Donna M. Harmon; James B. House; Curtis Massey; Kathleen H. Barton; Integrity Bank and f/b/o "IBAT," a Colorado corporation; and Stephen L. Schwartzbach eached filed proofs of claim against the bankruptcy estate as a secured claims arising from a transcript of judgment recorded on May 18, 2011, in the aggregate original amount of $6,608,198.29, or alternatively, as secured claims as beneficiaries of the Deed of Trust dated June 23, 2010.<br><br>The claims of the Class 10 claimants as beneficiaries of the Deed of Trust dated June 23, 2010 are allowed as a Class 5 claims.<br><br>To the extent that the claims are asserted as arising from the judgment lien created upon the filing of the transcript of judgment, the fair market value of Real Property is less that the amount of the senior secured claims (Class 2 through Class 9) and pursuant to 11 U.S.C. §506, the balance of the claims not paid as Class 5 claims will be treated as a Class 11 Unsecured Claim. |

2.    *Classes of Unsecured Priority Claims*

Certain priority claims that are referred to in §507(a)(1), (4), (5), (6) and (7) of the Code are required to be place in classes.  The Code requires that each holder of such claim receive cash on the effective date of the Plan equal to the allowed amount of such claim.  However, a class of holders of such claims may vote to accept different treatment.

The following chart lists all classes containing claims under §507(a)(1), (4), (5), (6) and (7) of the Code and their proposed treatment under the Plan:

| Class | Impairment | Treatment |
|---|---|---|
| Class 1 - Priority Claims | Unimpaired | No Class 1 claims exist.  No Proofs of Claim asserting entitlement to priority treatment have been filed. |

3.      *Classes of General Unsecured Claims*

General unsecured claims are not secured by property of the estate and are not entitled to priority under §507(a) of the Code.

The following chart sets forth the Plan's proposed treatment of Classes 11:

| Class | Description | Impairment | Treatment |
|-------|-------------|------------|-----------|
| 11 | Unsecured Claims | Impaired | Class 11 consists of any unsecured portion of claims in Classes 2 through 10 as a result of the bifurcation of the respective claims under Section 506 of the Bankruptcy Code or any other portion of the claims that may disallowed as secured claims.<br><br>It is not expected that unsecured claims will receive distributions under the plan.<br><br>To the extent that potential litigation is commenced by the Debtor and results in any monetary recovery, the net monetary recovery (after deduction of any associated fees, costs, or other expenses) shall be distributed the holders of Class 11 claims on a pro rata basis. |

4.      *Classes of Equity Interest Holders*

Equity interest holders are parties who hold an ownership interest (*i.e.* equity interest) in the Debtor.  In a corporation, entities holding preferred or common stock are equity interest holders. In a partnership, equity interest holders include both general and limited partners.  In a limited liability company ("LLC"), the equity interest holders are the members.  Finally, with respect to an individual who is a debtor, the Debtor is the equity interest holder.

The following chart sets forth the Plan's proposed treatment of the classes of equity interest holders:

| Class | Description | Impairment | Treatment |
|---|---|---|---|
| 12 | Equity Claims | Impaired | Mitchell Yellen, the sole member of the Debtor. Upon completion of the distributions to creditors in Classes 2 through 11, the membership interest will be cancelled and the Equity Claims will not receive any distributions under the plan and will not receive any property under the plan. |

D. **Means of Implementing the Plan**

The Debtor will fund the Plan through the sale of the Real Property as more fully set forth in Plan attached hereto as **Exhibit A**. Title to all estate property shall be vested in the Crossover Financial I Liquidating Trust ("Trust") on the Effective Date of Plan. Subject to an overbid procedure, the Real Property will then be sold by the Trust on a per lot basis Rivers Development, Inc., and/or assigns ("Purchaser") pursuant to the Contract to Buy and Sell Real Estate (Land) dated June 11, 2013 ("Contract"). The terms of the sale are summarized as follows:

**Purchase Price:** The proposed purchase price is based on a sales price of $15,000 per lot and provides for a minimum purchase price of $12,675,000 ($15,000 x 845 lots) with no maximum. Currently the planned development consists of 623 single family lots plus parcels for up to another 222 multifamily units. The Purchaser intends to amend the existing plan to increase the number of lots. A successful amendment could potentially increase the number of lots to approximately 1,000.

**Closing Schedule:** The Contract provides for multiple closings. The initial closing shall occur with eighteen months (18) of confirmation of the Plan for a minimum of 150 lots. Each subsequent closing will occur within 18 months of the prior closing:

Second Closing:       Minimum of 150 Lots within 18 month of Initial Closing.
Third Closing:        Minimum of 150 Lots within 18 month of Second Closing.
Fourth Closing:       Minimum of 150 Lots within 18 month of Third Closing.
Fifth Closing:        Minimum of 150 Lots within 18 month of Fourth Closing.
Final Closing:        Remaining Lots within 18 month of Final Closing.

The Contract further provides that if more than the minimum number of required lots is purchased at any closing, the minimum number of lots purchased at subsequent closings may be reduced.

**Option to Extend:** The Purchaser shall have a option to extend any single closing for up to one year. To exercise the option, the Purchaser is required to pay $150,000 which shall be considered non-refundable earnest money for the next closing.

**Entitlements:** Purchaser will be responsible for all costs associated with completion of the entitlement process for the property which is estimated to take between 12 to 18 months. Should Purchaser default or fail to close for any reason, Seller will receive all beneficial interests in the Entitlements.

**Capital Improvements**: To obtain approval of any final plat and to otherwise secure approval of the development project from various regulatory agencies the developer of HPR will be required to make certain upfront Capital Improvements that will benefit the entire HPR property.

Capital Improvements are expected to include but are not necessarily limited to:

Offsite Higby Road improvements;

Extending utility mains to the property;

Construction of a lift station;

and construction of a water tank.

Capital Improvements are distinguished from other improvements as they benefit the entire HPR property and cannot be attributed to any specific group of lots. A Capital Improvements budget shall be submitted to Seller for approval prior to commencement of any particular Capital Improvement. The costs of these Capital Improvements shall be prorated over the entire property rather than being a cost burden on only the initial lots developed. The sharing of these costs shall be accomplished through a Cost Adjustment as outlined below, provided however, the total cost of Capital Improvements subject to the Cost Adjustment shall not exceed $3,000.000.00.

**Cost Adjustment**: The Cost Adjustment will defer the costs of Capital Improvements over the entire HPR development. The costs of the Capital Improvements, not to exceed $3,000,000.00, will be allocated on a per lot basis: The total costs of Capital Improvements will be divided by the total number of lots in the final plat and assessed against each lot in equal amount. As an example, if the final land plan yields 1,000 lots and the Buyer is required to make $2.0 million in Capital Improvements, the Cost Adjustment will be $2,000 per lot.

The Buyer will receive a credit from the Purchase Price at the Initial Closing in an amount equal to the per lot Cost Adjustment multiplied by remaining lots not being purchased. Again by way of example using the same assumptions as above, at the Initial Closing of 150 lots, the Buyer would receive a credit of $1.7 million (850 remaining lots x $2,000 per lot) toward the Purchase Price of $2,250,000.00.

The Purchase Price of each subsequently acquired lot will be increased by the same Cost Adjustment. Using the same example, lots acquired in the second through final closing would be acquired for a minimum of $17,000.00 per lot ($15,000 purchase price, plus the Cost Adjustment).

-30-

**Market Adjustment**: The per lot sales price is $15,000 minimum. The anticipated fully developed lot average sale price is $75,000. In the event market conditions improve, Seller shall receive 25% of any sale price exceeding an average sale price of $75,000. The average shall be calculated on the entirety of lots within each closing.

**Earnest Money Deposit**: Due to the large investment being made for completion of the Entitlements, the earnest money deposit will be $25,000 to be held with Legacy Title. The deposit shall become non-refundable upon the expiration of the Inspection Period.

**Inspection Period:** Purchaser shall have sixty (60) days following Bankruptcy Court approval of the Contract to review and documentation related to the development and approve the physical condition of the Property. Purchaser may terminate the Contract prior to the expiration of the Inspection Period.

**Title:** Seller will provide good and marketable title free and clear of liens and encumbrances. Seller shall provide title insurance at each closing.

**Funds at Closing:** Purchaser shall pay for all lots at each closing with cash or good funds.

**Closing Costs:** All real estate taxes, operating expenses and rents received by Seller, if any, shall be prorated at closing. Other closing costs shall be split equally between Purchaser and Seller.

Pursuant to 11 U.S.C. §§ 1123(a)(4) and (5) and 363(f), the sale of the property of the estate will be free and clear of liens or encumbrances against the property **with such liens or encumbrances to attach to the proceeds of sale to the same extent and in the same order and priority as such liens and encumbrances presently exist.**

All liens and encumbrances against the property, of public record or not, will be released, with the security interests evidenced thereby to be substituted in the form of the proceeds of the sale of the property, which security interests shall attach to such sale proceeds in the same order of priority as existed prior to such sale.

From the proceeds of sale, it is anticipated that the following expenses will be paid at closing:

a.      An amount necessary to satisfy any outstanding real estate taxes including the Bankruptcy Estate's pro rata share of accrued but not yet payable real estate taxes;

b.      Other actual and necessary expenses incident to the closing of the sale such as title insurance, customary closing fees and applicable escrows; and

c.      Any reasonable and necessary adjustments or credits that may be necessary to close any proposed sale; and

-31-

The liens, encumbrances or interests held by Class 2, 3, 4, 5, 6, 7, 8, 9 and 10 claimants will attach to the remaining proceeds of sale. After the payment of allowed administrative expenses, proceeds of sale will distributed in accordance with terms of the plan of reorganization.

On the Effective Date of the Plan, the Debtor will enter into the Crossover Financial I Liquidating Trust Agreement ("Trust Agreement") for the benefit of the holders of claims against the bankruptcy estate. On the Effective Date, legal title to all Trust Assets shall be vested in the Trust in accordance with and pursuant to the terms of the Plan and the Trust Agreement. Except as otherwise provided in the Plan, on the Effective Date, the Trustee, on behalf of the Trust, shall be: (i) authorized to act as representative of the Debtor's Estate in respect of any and all claims or causes of action that constitute Trust Assets or assets of the Trust Estate (ii) substituted as successor to the Debtor (a) in all actions and proceedings pending or thereafter commenced in the Bankruptcy Court or elsewhere in regard to the Trust Assets or the Trust Estate, and (b) in all actions and proceedings pending or thereafter commenced in the Bankruptcy Court, including Avoidance Actions as defined in the Plan.

C. Randel Lewis, Principal and Founder of Western Receiver, Trustee & Consulting Services Ltd., will serve as the Liquidating Trustee. Mr. Lewis will be entitled to compensation for his services on an hourly basis at his normal hourly rate of $385 per hour. The Liquidating Trustee's duties shall include, but are not limited to:

a.)     Preserving and maintaining the property conveyed to the trust;

b.)     Effectuating the distributions to claimants pursuant to the terms of the Plan;

c.)     Evaluating and determining the highest and best offer in the event that competing bids for the purchase of the estate property are submitted;

d.)     Conveying the estate property to the purchaser;

e.)     In the event of a default in the by the purchaser, liquidating any remaining property in a manner best suited to maximize the distributions to claimants at the sole discretion of the Trustee; and

f.)     Take any other reasonable actions necessary to administer the Trust and effectuate the terms of the Plan.

The sale of the property will be subject to an overbid process. The Liquidating Trustee shall accept competing bids for the purchase of the real property from qualified bidders for a period of sixty (60) after the Effective Date of the Plan. To qualify, the bidder must provide evidence of the financial ability to close. In the event that a qualified competing bid is received, the Liquidating Trustee will propose an auction procedure on notice to the Trust Beneficiaries. Any objections to the proposed auction must be submitted, in writing, to the Liquidating Trustee within fourteen days of the notice. In the event any objections cannot be consensually resolved, the Liquidating Trustee

reserves the right to seek Bankruptcy Court approval of the procedures.  The Liquidating Trustee, in his sole discretion, will determine which competing offer, if any, is the highest and best offer.

Rivers Development, Inc., and/or assigns, shall have a right of first refusal to match any competing bid.  In the event Rivers Development, Inc., and/or assigns, does not match any competing bid it shall have the right to apply to the Bankruptcy Court for reimbursement of any actual and necessary costs incurred with the initial offer as Chapter 11 priority expenses.  Any such application would be subject to notice and the opportunity to object by creditors and parties in interest, including the Liquidating Trustee.

E.       **Risk Factors**

The most significant risk to the Plan is that the sale price of the Real Property will be less than anticipated.  During the last six months residential real estate development along the front range has increased and the Debtor believes through a comprehensive marketing strategy the highest and best price will be obtained for the sale of the property.

F.       **Executory Contracts and Unexpired Leases**

Article XI of the Plan lists all executory contracts and unexpired leases that the Debtor will assume under the Plan.  Assumption means the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any.  Article XI of the Plan also lists how the Debtor will cure and compensate the other party to such contract or lease for any such defaults.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to confirmation of the Plan, unless the Court has set an earlier time.

All executory contracts and unexpired leases that are not listed in Article XI of the Plan will be rejected under the Plan.  Consult your adviser or attorney for more specific information about particular leases or contracts.

If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to confirmation of the Plan.

***Under the terms of the Plan, the Deadline for Filing a Proof of Claim Based on a Claim Arising from the Rejection of a Lease or Contract is no later than thirty (30) days after the date of the order confirming this Plan***.  Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.

-33-

G. **Tax Consequences of the Plan**

*Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys and/or Advisors.*

IV. **CONFIRMATION REQUIREMENTS AND PROCEDURES**

To be confirmable, the Plan must meet the requirements listed in §1129(a) or (b) of the Code. These include the requirements that: the Plan must be proposed in good faith; at least one impaired class of claims must accept the Plan, without counting the votes of insiders; the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible. The requirements are <u>not</u> the only requirements listed in §1129, and they are not the only requirements for confirmation.

A. **Who May Vote or Object**

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for the purposes of voting and (2) impaired.

In this case, the Plan Proponent believes that classes 4, 5, 6, 7, 8, 9, 10, 11 and 12 are impaired and that holders claims in each of these classes are therefore entitled to vote to accept or reject the Plan. The Plan Proponent believes that classes 1, 2 and 3 are unimpaired and that holders of claims in each of these classes, therefore, do not have the right to vote to accept or reject the Plan.

1. *What is an Allowed or an Allowed Equity Interest?*

Only a creditor or equity interest holder with an allowed claim or allowed equity interest has the right to vote on the Plan. Generally a claim or equity interest is allowed if either (1) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed contingent or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless as objection has been filed to such proof of claim or equity interest. When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

-34-

On July 18, 2011, the Court entered an order establishing **September 6, 2011, as the deadline for filing proofs of claim** (Docket No. 31).

    2.     *What is an Impaired Claim or Equity Interest?*

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is *impaired* under the Plan. As provided in §1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of members of that class.

    3.     *Who is **Not** Entitle to Vote*

The holders of the following five types of claims and equity interests are *not* entitled to vote:

- holders of claims and equity interest that have been disallowed by an order of the Court;

- holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes;

- holders of claims or equity interests in unimpaired classes;

- holders of claims entitled to priority pursuant to §507(a)(2), (3) and (8) of the Code;

- holders of claims or equity interests that do not receive or retain any value under the Plan; and

- administrative expenses.

***Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan.***

    4.     *Who Can Vote in More Than One Class*

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise holds claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

-35-

B.      **Votes Necessary to Confirm the Plan**

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes, as discussed later in Section B.2.

1.      *Votes Necessary for a Class to Accept the Plan*

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (½) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

2.      *Treatment of Nonaccepting Classes*

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan in the nonaccepting classes are treated in a manner prescribed by §1129(b) of the Code. A plan that binds nonaccepting classes is commonly referred to as a "cram down" plan. The Code allows the Plan to bind nonaccepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of §1129(a)(8) of the Code, does "discriminate unfairly," and is "fair and equitable" toward each impaired class that has not voted to accept the Plan.

*You should consult your own attorney if a "cram down" confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.*

C.      **Liquidation Analysis**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim or equity interest holders would receive in a chapter 7 liquidation. Because the Plan provides for the liquidation of property of the estate the primary difference between the Plan and liquidation through a Chapter involves allowable administrative expenses. Under 11 U.S.C §326, a Chapter 7 Trustee is entitle to assert a claim for compensation based on the gross proceeds collected by the bankruptcy estate. The statute provides for a commission of 25% of the first $5,000 collected; 10% of the next $45,000 collected; 5% of amount collected between $50,000 and $1,000,000; 3% of amounts collected in excess of $1,000,000. The difference between the Plan and hypothetical Chapter 7 Liquidation is illustrated below:

-36-

|  | Chapter 11 Plan | Chapter 7 Liquidation |
|---|---|---|
| Gross Sales Price of Real Property (Minimum Price under Rivers Development, Inc., sale versus the highest price received to date under letter of intent) | $12,675,000.00 | $6,405,000.00 |
| Less:    Closing Costs (Estimated) | ($25,000.00) | ($25,000.00) |
| Brokers' Commission (5%) | $0.00 | ($320,250.00) |
| Estimated Chapter 11 Administrative Expenses | ($75,000.00) | $0.00 |
| Estimated UST Quarterly Fees | ($13,000.00) | $0.00 |
| Estimated Chapter 7 Administrative Expenses | $0.00 | ($170,400.00) |
| CCV Secured Claim (Class 2) | ($498,955.08) | ($498,955.08) |
| CCV2 Secured Claim (Class 3) | ($162,450.81) | ($162,450.81) |
| Allen & Vellone Secured Claim (Class 4) | ($85,711.96) | ($85,711.96) |
| **Funds Available to Pay Noteholder Claims** | **$11,814,893.15** | **$5,142,239.15** |

Under the Plan, Noteholders would receive more than twice as much than under a Chapter 7 Liquidation. In addition, the Plan provides for the flexibility to seek funding to proceed with development.

The DeCelles Creditors commenced litigation in state court against the Debtor as well as the other Noteholders arguing that the claims asserted by Colorado Capital Ventures 2, LLC Allen & Vellone, P.C., and Colorado Capital Ventures 3, LLC, as well as the Deed of Trust granted in favor of the Noteholders can be set aside under the provisions of the Colorado Uniform Fraudulent Act. While the Debtor believes that such claims would not succeed, even if a Chapter 7 Trustee elected to pursue the claims and was successful in avoiding the claims of Colorado Capital Ventures 2, LL ($162,450.81); Allen & Vellone, P.C. ($85,711.96); and Colorado Capital Ventures 3, LLC ($16,184.34), Noteholders would still receive a higher distribution under the Chapter 11.

In the Debtor's opinion, it is unlikely that a trustee would seek to avoid the Deed of Trust issued in favor of the Noteholders. As the secured claims asserted by the DeCelles Creditors and those arising from the transcript of judgment recorded on May 18, 2011 (the "Bowman Creditors") are avoidable as preferential transfers, such an action would only inure to benefit of Ross A. Reineke. Mr. Reineke's secured claim arises from a judicial lien created by the filing of a transcript of judgment outside of the 90 day preference period but is junior to the Deed of Trust granted in favor of all the Noteholders. Under such a scenario, after the payment of Mr. Reineke's claim in full ($630,248.27) remaining proceeds would be distributed to all other creditors of the estate as unsecured creditors on a pro rata basis.

-37-

D.     **Feasibility**

The Court must find that confirmation of the Plan is not likely to be followed by liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.  The Debtor's Plan provides for the liquidation of estate property.

*You Should Consult with Your Accountant of other Financial Advisor If You Have Any Questions Pertaining to These Projections.*

V.     **EFFECT OF CONFIRMATION OF PLAN**

A.     **NO DISCHARGE OF DEBTOR**

While the provisions of a confirmed plan bind the debtor and any creditor or equity security holder, whether or not the claim or interest of such creditor or equity security holder is impaired under the plan and whether or not such creditor or equity security holder has accepted the plan, because the Debtor is not an individual and the plan provides for the liquidation of the property of the estate, in accordance with Section 1141(d)(3) of the Bankruptcy Code, the Debtor will not receive any discharge of debt in this bankruptcy case.

B.     **Modification of Plan**

The Plan Proponent may modify the Plan at any time before confirmation of the Plan. However, the Court may require a new disclosure statement and/or revoting on the Plan.

Upon request of the Debtor, the United States trustee, or the holder of an allowed unsecured claim, the Plan may be modified at any time after confirmation of the Plan but before completion of payments under the Plan, to (1) increase or reduce the amount of payments under the Plan on claims of a particular class, (2) extend or reduce the time period for such payments, or (3) alter the amount of distribution to a creditor whose claim is provided for by the Plan, to the extent necessary to take account of any payment of the claim made other than under the Plan.

C.     **Final Decree**

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Plan Proponent, or such other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case. Alternatively, the Court may enter such a final decree on its own motion.  The Debtor anticipates

-38-

filing a motion to administratively close the case once required payments under the Plan have been commenced.

Dated: June 12, 2013

CROSSOVER FINANCIAL I, LLC

By: /s/ Mitchell B. Yellen
        Mitchell B. Yellen, Managing Member

APPROVED AS TO FORM

/s/ Stephen C. Nicholls
Stephen C. Nicholls, #30139
NICHOLLS & ASSOCIATES, P.C.
1850 Race Street
Denver, CO 80206
(303) 329-9700
(303) 329-6950
steve.nicholls@nichollslaw.com

Attorneys for Debtor

-39-